■ ROBERT OBEY, Appellant, v CITY OF NEW YORK, Defendant, and NEW YORK CITY TRANSIT AUTHORITY, Respondent. [37 NYS3d 527]—

Order, Supreme Court, New York County (Geoffrey D. Wright, J.), entered May 22, 2014, which granted defendant New York City Transit Authority's (NYCTA) posttrial motion to set aside the verdict on the issue of liability and dismiss the complaint, and denied plaintiff's motion to set aside the jury's award for past and future pain and suffering, affirmed, without costs.

Plaintiff was traveling from a methadone clinic in Manhattan, where he received treatment for his heroin addiction, to his shelter on Staten Island, when he slipped on the platform of the 33rd Street subway station, hit his head, fell onto the tracks, and was injured by a train. Plaintiff has no memory of the incident from the moment he slipped until after he was assisted by medical personnel. A psychologist who treated plaintiff two days after the accident testified, based on her contemporaneous notes, that plaintiff informed her that on the morning of his accident he had been "high on Xanax and Klonopin," psychoactive prescription drugs that can cause dizziness and, if abused, fainting. However, at trial plaintiff denied taking illegal drugs on the day of the accident, and attributed his fall and memory loss to slipping and hitting his head.

Plaintiff testified that he entered the 33rd Street station around 11:15 a.m. He was discovered injured on the tracks at 11:58 a.m. Plaintiff does not recall when he fell onto the tracks, and the record contains no evidence casting light on the particular time the fall occurred during the window between plaintiff's entering the station and his subsequent discovery on the tracks. Over the course of the approximately 45 minutes that plaintiff may have been lying on the tracks, at least three trains passed through the 33rd Street station. The first train was operated by Daniel Correa, the second train—the train that plaintiff claims to have injured him—was operated by Abraham Lopez, and the third train (which did not injure plaintiff) was operated by Jacqueline White. Although a large pool of blood was found on the tracks, and stains that appeared to be blood were discovered on four separate cars of Correa's train, Correa denied observing plaintiff lying on the tracks. While Lopez's train did not have any blood stains, Lopez reported observing white sneakers on the tracks, and called in an alert to a possible obstacle on the tracks.* Subsequently, White entered the station at a reduced speed due to Lopez's

---

* According to a dispatcher's note, Lopez reported having seen a "body" on the tracks. Lopez denies having seen a body on the tracks. As more fully discussed below, even if the dispatcher's note is accurate, this does not constitute evidence that Lopez's train, rather than Correa's, injured plaintiff.

alert, and stopped her train when she saw passengers on the platform waving and pointing at plaintiff on the tracks.

As noted, plaintiff alleges that Lopez's train injured him and that Lopez negligently failed to stop the train after observing sneakers on the tracks. After a trial, the jury apportioned fault for plaintiff's injury 60% to plaintiff himself and 40% to NYCTA, and awarded damages. Upon NYCTA's posttrial motion, Supreme Court set aside the verdict and dismissed the complaint, holding that plaintiff had failed to make a prima facie showing either that Lopez had caused plaintiff's injury or that Lopez had acted negligently. Plaintiff having appealed, we affirm on both grounds.

Initially, as to causation, plaintiff failed to satisfy his burden to produce credible evidence showing that Lopez's train, as opposed to Correa's train, caused his injury. In *Seong Sil Kim v New York City Tr. Auth.* (27 AD3d 332 [1st Dept 2006], *lv denied* 7 NY3d 714 [2006]), an alert was issued to all trains after a train passenger reported seeing a person on the tracks. Subsequently, the defendant's train operator spotted the plaintiff on the tracks and engaged the emergency brake, but was unable to stop the train before the first car of the train passed over the plaintiff (*id.* at 333). This Court set aside a jury verdict against the defendant as "pure speculation," explaining that there was insufficient evidence that the defendant's train had actually injured the plaintiff, as multiple trains passed over the tracks after the alert, no blood was found on the defendant's train, and the plaintiff's sole evidence showing causation was that the injured plaintiff was discovered lying between the tracks under the defendant's train (*id.* at 335).

Here, as in *Kim,* the record is devoid of evidence from which the jury could have made a nonspeculative finding as to which train—Correa's or Lopez's—injured plaintiff. The evidence shows that Correa's train passed through the 33rd Street station after plaintiff testified to entering the station, and it is mere speculation to assert that plaintiff fell to the tracks only after Correa's train had passed through the station.

In fact, the physical evidence points to Correa's train as the proximate cause of plaintiff's injuries. What appeared to be bloodstains were discovered on four cars of Correa's train, while no bloodstains were discovered on Lopez's train. Plaintiff's strained arguments that the apparent bloodstains on Correa's train may have actually been grape juice, and that Lopez's train may have had no bloodstains due to the weight and heat of the train instantly cauterizing them, are internally inconsistent, as plaintiff points to the large pool of blood found on the

tracks to determine the location of the accident. Moreover, plaintiff offers no explanation of why any blood on Lopez's train would have been cauterized but the similar substance on Correa's train was not.

Plaintiff erroneously relies upon Lopez's report of observing sneakers on the tracks, while Correa denied observing anything on the tracks, as evidence that Lopez's train, as opposed to Correa's train, injured plaintiff. It is undisputed that plaintiff entered the station before both Correa's train and Lopez's train passed through the station. Thus, either Correa's train or Lopez's train could have been the one that actually injured plaintiff. The disputed issue is whether Correa's train injured plaintiff before Lopez's train passed through the station, or whether Lopez's train injured plaintiff. Under either circumstance, Lopez could have observed the sneakers, or even plaintiff's body (as stated in the aforementioned dispatcher's note), near the tracks. Therefore Lopez's testimony that he observed sneakers, and even the dispatcher's note stating that he reported seeing a body, does not show whether Lopez's train injured plaintiff or whether Correa's train had previously injured plaintiff. Further, Correa's testimony that he did not see a person on the tracks does not establish that plaintiff had not already fallen when Correa's train passed through the station, especially given that blood was found on Correa's train but not on Lopez's train. In sum, as in *Kim*, plaintiff failed to make a prima facie showing that Lopez caused his injury, and the jury verdict was based upon pure speculation.

Turning to the issue of whether Lopez acted negligently, assuming arguendo that Lopez's train caused plaintiff's injury, plaintiff failed to make a prima facie showing that Lopez could have avoided injuring plaintiff if he had activated the train's emergency brake upon observing plaintiff's sneakers (*see Dibble v New York City Tr. Auth.*, 76 AD3d 272 [1st Dept 2010], *appeal withdrawn* 17 NY3d 791 [2011]; *Mirjah v New York City Tr. Auth.*, 48 AD3d 764 [2d Dept 2008]).

The 33rd Street station platform is 512.5 feet long, enabling 10 50-foot cars of a train to stop at its platform. The evidence indicated that plaintiff was injured approximately 100 feet from the end of the station where a large pool of blood was discovered. The disputed issue is how far Lopez was into the station before observing the sneakers. Lopez's written report on the day of the accident and his trial testimony indicated he was almost fully stopped and towards the end of the station before observing the sneakers. Lopez's written report notes that he observed the sneakers "[a]s I made my station stop,"

and at trial Lopez testified that he was almost at the end of the station when he observed the sneakers a few feet in front of the train.

Nevertheless, plaintiff argues that an incident report noting that Lopez orally reported observing sneakers "as he was entering 33rd Street" constitues sufficient evidence to support a finding that Lopez observed the sneakers immediately upon entering the station, from a 400 foot distance. Accordingly, plaintiff's expert testified that if Lopez had 400 feet to react and was traveling at a speed of 25 miles per hour (mph), as Lopez claimed he had been when entering the station, Lopez would have had approximately 6.5 seconds to react and engage the emergency brake to stop the train before reaching the sneakers.

However, plaintiff, implicitly acknowledging that the evidence does not show that Lopez had observed the sneakers immediately upon entering the station, introduced further expert testimony that the headlights on Lopez's train illuminated the otherwise dark train tunnel for a range of between 50 and 150 feet, and that if Lopez had observed the sneakers from a distance of 150 feet at a speed of 15 mph (which Lopez testified had been his speed when approaching the required stopping point), he would have had 3.5 seconds to react.

The Court of Appeals has explained that a train operator "may be found negligent if he or she sees a person on the tracks 'from such a distance and under such other circumstances as to permit him [or her], in the exercise of reasonable care, to stop before striking the person'" (*Soto v New York City Tr. Auth.*, 6 NY3d 487, 493 [2006], quoting *Coleman v New York City Tr. Auth.*, 37 NY2d 137, 140 [1975]). Contrary to the dissent's arguments that our holding here "eviscerate[s]" *Soto*, this Court and our colleagues in the Second Department have explained that *Soto* does not relieve a plaintiff of the burden to introduce competent evidence, nor does it allow a plaintiff to rely solely on conclusory assertions and mere speculation (*see Dibble*, 76 AD3d at 277; *Mirjah*, 48 AD3d at 765-766). Similar to the plaintiffs in *Dibble* and *Mirjah*, plaintiff has failed to make a prima facie showing that Lopez had sufficient time to stop the train after observing the sneakers. Plaintiff conclusorily asserts that Lopez had 3.5 seconds to react if he observed the sneakers at the 150 foot outer range of the train's headlights, as at 15 mph the train would require 75 feet to stop, leaving 3.5 seconds to react. However, there is no competent evidence in the record to support plaintiff's assertion that Lopez actu-

ally observed the sneakers from a distance of 150 feet. Perhaps Lopez observed the sneakers from a 100 foot distance and had a little over one second to react, the reaction time we found insufficient to impose liability in *Dibble* (76 AD3d at 279-280). Or perhaps Lopez observed the sneakers from a 50 foot distance and could not possibly have avoided passing them.

Evidence consisting of mere speculation as to when Lopez actually observed the sneakers does not suffice to make a prima facie showing that Lopez could have avoided passing them. There is not a scintilla of competent evidence pointing to Lopez actually observing the sneakers while he had sufficient time to react. As the submitted evidence shows that it was equally as likely that Lopez did not have time to stop the train as it was likely that he did have time to stop the train, the jury's verdict was based upon pure speculation.

We have considered plaintiff's remaining arguments regarding liability and find them unavailing. Given the foregoing determination, we need not consider plaintiff's arguments regarding damages. Concur—Tom, J.P., Friedman and Gesmer, JJ.

Richter and Gische, JJ., dissent in a memorandum by Gische, J., as follows: I respectfully dissent and would vote to reverse in favor of reinstating the jury's verdict both as to liability and damages. While the evidence of liability is not free from dispute, the jury resolved those disputed issues in favor of plaintiff and the verdict is supported by a legally sufficient view of the evidence. There is sufficient evidence to support a conclusion that it was the subway train operated by Abraham Lopez that struck plaintiff. There is also sufficient evidence that Lopez failed to operate the train in a reasonable manner when, after seeing evidence of a human presence on the tracks (white sneakers), he failed to take any action to avoid striking plaintiff, although able to do so (*Soto v New York City Tr. Auth.*, 6 NY3d 487 [2006]). I believe that the trial court and majority's reliance on our prior decision in *Dibble v New York City Tr. Auth.* (76 AD3d 272 [1st Dept 2010]) as the legal basis to set aside the jury's verdict is misplaced. By reading *Dibble*, a decision predicated on the limits of the expert testimony given in that case, in such an expansive manner, they eviscerate the Court of Appeals' decision in *Soto*, which held that a train operator may be found negligent if he or she fails to bring the train to a safe stop if the circumstances permit him or her to do so (*Soto*, 6 NY3d at 493).

It is undisputed that on May 9, 2006, plaintiff fell into the subway tracks at the 33rd Street downtown station of the

number 6 train and was struck by a train shortly before noon. His left foot was severed in the accident. The plaintiff could not recall how he wound up on the subway tracks, testifying that shortly before the accident, he had been at a methadone clinic where he received medication; he denied using any other drugs. The jury rendered a verdict in plaintiff's favor. It apportioned, however, 60% of the liability to plaintiff and only a lesser percentage, 40%, to defendant New York City Transit Authority (NYCTA). Defendant moved to set aside the verdict and the trial court granted the motion, largely on the basis of *Dibble*, finding that because the train operator had no prior warning of a person on the tracks, defendant was not negligent as a matter of law and further that plaintiff's expert's testimony was speculative. The majority now affirms, holding that the evidence does not conclusively identify that it was the subway train operated by Lopez that struck plaintiff and that the expert's testimony was speculative.

It is black letter law that a jury verdict should not be set aside as based upon legally insufficient evidence unless "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [jurors] to the conclusion reached by the jury on the basis of the evidence presented at trial" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]; *Soto*, 6 NY3d at 492). Under this highly deferential standard, a court should not interfere with the jury's fact-finding function simply because it would have evaluated credibility differently (*Gartech Elec. Contr. Corp. v Coastal Elec. Constr. Corp.*, 66 AD3d 463 [1st Dept 2009], *appeal dismissed* 14 NY3d 748 [2010]). Additionally, when the verdict is based upon expert testimony, the jury is free to accept or reject such testimony, either in whole or in part (*Sicignano v New York City Tr. Auth.*, 126 AD3d 595, 596 [1st Dept 2015]). An expert's testimony is not speculative if it is based upon facts in the record, or otherwise known to him or her personally (*Soto* at 494; *Espinosa v A & S Welding & Boiler Repair*, 120 AD2d 435, 437 [1st Dept 1986], *lv denied* 69 NY2d 604 [1987]). The trial record in this case presents sufficient facts to uphold the jury determination.

Although plaintiff has limited recollection of exactly what happened on March 9, 2006, the day of the accident, much of the trial evidence, including Lopez's own testimony, the testimony of two other train operators, and an incident report prepared by a NYCTA employee, sets forth in reasonable detail the events of that morning. Lopez, the train operator involved in the incident, testified that at some point before bringing the train to a stop in the 33rd Street station and while the train

was in braking mode, he saw something on the tracks that he thought looked like white sneakers. In his deposition testimony, read into evidence, Lopez testified that he had been approaching the 33rd Street station at approximately 25 miles per hour (mph), which is his custom and practice, and was approximately two cars into the station when he began to apply the brakes slowing the train down to approximately 10 to 15 mph in order to make his regular stop. He estimated he saw the sneakers approximately 35 feet away from the 10-car marker where he was required to bring the train to a complete halt. Lopez did not apply the emergency brakes upon seeing the objects he thought were sneakers or at anytime while coming into the station, nor did he testify that he was unable to do so. He stated that he does not stop the train every time he sees debris on the roadbed. Lopez testified that he proceeded to the next station, as usual, although he glanced out the window and no longer could see the sneakers.

NYCTA personnel prepared a train incident report dated March 9, 2006, which contains an entry that Lopez contacted NYCTA's control center shortly before noon (1156 hours) to report that he thought he had seen "a body on the south end of Track #1" at the 33rd Street station. The incident report also reflects that Lopez placed a second call to NYCTA's control center at 1215 hours, approximately 19 minutes later, to report that "as he was entering 33rd Street, he thought he might have seen something between the running rail[s], since his train did not go into emergency, he did not investigate any further." That entry, made by a NYCTA supervisor, indicates that Lopez contacted him "[a]fter he thought about it . . . to caution the next train." At trial, Lopez denied the accuracy of both entries, testifying that he had never reported seeing a "body" on the tracks only that he had seen something he thought were sneakers, and he had never made a second call to NYCTA's control center. A third entry in the incident report states that at 1307 hours "a large pool of blood" was found near survey marker 138+00, and traces of blood were also found at markers 44 and 45.

Although no traces of blood or tissue were recovered from Lopez's train, plaintiff's expert, Dr. Carl Berkowitz, testified that the weight of the train and the 600 degree heat generated by its wheel, would have cauterized plaintiff's wound, to account for why no blood was found on Lopez's train. A substance of what "appeared to be blood" was, however, cleaned from under the train operated by Daniel Correa, which had traveled through the 33rd Street station immediately before Lopez's train. That substance was never tested.

Daniel Correa testified at trial that while traveling through the 33rd Street station, he did not see anyone fall onto the tracks in front of him. He denied seeing anything unusual on the tracks or the roadbed that day and stated that if he had seen anyone, he would have been required to stop the train if he could. The operator of the train immediately after Lopez's train, Jacqueline White, discovered the wounded plaintiff on the tracks when passengers on the platform began frantically waving their arms to get her attention as her train entered the station. I believe that these facts provided a sufficient basis for the jury to have rationally concluded that it was the train operated by Lopez that actually struck plaintiff. Although Lopez denied seeing a human presence on the train tracks that day or that the white sneakers on the tracks constituted anything other than debris, the jury was free to reject his testimony, especially in view of the fact that the entries in NYCTA's incident report were at odds with Lopez's account. The jury was also free to conclude that it was unreasonable for Lopez to have thought that the pair of white sneakers he saw on the tracks were simply debris and not evidence of a human presence. Likewise, the jury was also free to accept Correa's testimony that he did not see any indication of a human presence on the track at the time that he was passing through the 33rd Street station. Nor was the jury required to accept that the untested material on Correa's train was human blood.

The majority's reliance on *Seong Sil Kim v New York City Tr. Auth.* (27 AD3d 332 [1st Dept 2006], *lv denied* 7 NY3d 714 [2006]), is misplaced and the unique facts of that case make it easily distinguishable. In *Kim*, a 911 operator relayed a called to the defendant, NYCTA, that a passenger on a southbound A train had seen a person on the tracks at 34th Street and 8th Avenue. The passenger, however, did not immediately place that 911 call, but waited until he had reached his destination in Brooklyn, an estimated 18 minutes later. In response to that 911 call, the defendant issued a "caution" warning to its train operators traveling through that area to slow down to no more than 10 to 15 mph. During the approximately 18-minute period of time that elapsed between the passenger's observation of the person already on the tracks and his placement of the 911 call, a number of trains (at least three) had traveled through that station. After the accident the trains were examined, but none were found to have any signs of having struck the plaintiff. Here, in contrast, Correa's testimony provided a basis from which a jury could rationally conclude that plaintiff was not on the tracks when the train operated by Correa passed though the station. There was, however, further evidence that plaintiff

was on the tracks by the time the train operated by Lopez passed through the station. Contrary to the majority's conclusion, under this version of the facts, it is not equally plausible that either train could have hit plaintiff. Furthermore, the opinion of the plaintiff's expert in *Kim*, that defendant should have issued an "extreme caution" warning to its train operators, which would have required them to reduce their speed to no more than 10mph, was offered without any basis for that conclusion, scientific or otherwise, but was simply the expert's impression of how the situation should have been handled (27 AD3d at 334).

I also disagree with the majority's conclusion that plaintiff failed to submit nonspeculative evidence that the train operator had adequate time and distance to observe plaintiff, so as to avoid hitting him. Under established jurisprudence from the New York Court of Appeals, we have long recognized that a train operator may be found negligent if he or she sees a person on the tracks from such a distance and under such other circumstances as to permit him or her in the exercise of reasonable care to stop before striking the person (*Soto*, 6 NY3d at 493; *Coleman v New York City Tr. Auth.*, 37 NY2d 137, 140 [1975]). A jury may rely upon an expert's mathematical calculations in concluding that a train could have been stopped before striking the plaintiff, provided the information serving as the basis for the calculations is in the record, or personally known to the expert. Thus in *Soto*, the expert was allowed to rely on mathematical calculations based, in part, on the plaintiff's testimony regarding an estimate of his running speed at the time of his accident derived from using a treadmill (*Soto* at 493).

In this case, plaintiff's expert witness, Dr. Berkowitz, a transportation safety expert, testified that he had visited the 33rd Street station, taken measurements, and examined documents, photographs, and records, among other things, including the train incident report and NYCTA's own July 12, 1995 Emergency Brake Stopping Distances for Customer Cars chart (braking chart). The braking chart depicts in graph form the distance in feet required to stop a train applying the emergency brakes, relative to its speed in miles per hour. The braking chart shows, consistent with the laws of physics, that at slower speeds, less distance is needed to stop a train, whereas at faster speeds, the distance needed to stop is greater. Berkowitz testified that based upon the total length of the station (512.5 feet), and the evidence of where blood was found at the 138+00 marker, plaintiff was struck approximately 98 feet from the

front of the platform, or 414.5 feet from the north portal of the station. Using a simple mathematical calculation, Berkowitz estimated that applying the braking distances set forth in NYCTA's own braking chart, and assuming Lopez was correct about his speed of entry (25 mph), the train would have come to a complete stop at 180 feet. At 36 seconds per foot, Lopez had 6.52 seconds available to him in which to act and still avoid hitting plaintiff. At the lesser speed Lopez testified he was traveling at when approaching the 10-car marker (i.e., 15 mph), the train would have traveled an even shorter distance before stopping, and Lopez would have had even more time (8.42 seconds) to activate the emergency brakes.

Dr. Berkowitz's calculations were all based on evidence otherwise before the jury. The jury had the right and obligation to decide from the conflicting evidence Lopez's physical location in the station when he first observed the sneakers. As the majority concedes, although Lopez testified that he was almost at the end of the station before he observed the sneakers, the incident report indicates that Lopez orally reported to NYCTA that he had observed the sneakers as he was entering the 33rd Street station; this report by him was made shortly after the accident actually occurred. The jury, therefore, had a basis to rationally conclude that Lopez had between 6.52 and 8.42 seconds to bring the train to a stop without hitting plaintiff. They could have reasonably concluded that this time was sufficient.

In my view, *Dibble* should be limited to its facts and not read expansively to preclude any expert evidence about speed, distance and accident avoidance in cases where negligence by a train operator is alleged. *Dibble* is improperly being relied upon for a general proposition that calculations about emergency stopping times of trains is speculative. In *Dibble* the train operator applied the emergency brakes when he first noticed a human form on the tracks (76 AD3d at 274). The expert, however, opined that the train operator had not reacted fast enough and had he done so, he could and should have stopped the train in time to avoid hitting plaintiff (*id.* at 278-279). This was based upon a wholly speculative assumption that average human reaction time for train operators was faster than this train operator's actual reaction time (*id.* at 280). This Court, finding that the estimates of human reaction time, which formed the basis of the expert's calculations had no basis in the record, reversed the jury verdict (*id.* at 280-281). This Court also declined to predicate liability on the fact that some train operators may react faster than others (*id.*). In

the case before us, however, there is no dispute that Lopez made no effort to stop the train at all. Thus, the issue is not whether Lopez was negligent in not stopping sooner or faster, but rather whether he was negligent because he could have, but did not, make any effort to stop the train at all, given that he had time in which to do so and avoid hitting plaintiff. The expert in this case did not make any calculations based on estimated reaction times. Dr. Berkowitz made concrete mathematical calculations based upon evidence in the record and it was the jury that decided there was sufficient time to stop. I believe that if we read *Dibble* in such a way to set aside the jury verdict in this case, we are making it impossible for a plaintiff to ever prove liability based upon a train operator's failure to stop. Clearly, such a result would be in contravention of the Court of Appeals' authority recognizing a cause of action for a train operator's negligent failure to stop in time.

I would reinstate the verdict on liability. I would also, however, find that plaintiff's cross appeal, claiming that the damages awarded were too low, has no merit. I would, therefore, affirm the denial of plaintiff's motion to set aside the damages award and reinstate the damages awarded by the jury.